

FILED

JUN 2 5 2019

Clerk, U S District Court
District Of Montana
Billings

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>PORFIRIO CARILLO REA,<br><br>Defendant. | CR 19-07-BLG-SPW<br><br>OPINION AND ORDER |

Before the Court is Defendant Porfirio Carillo Rea's motion to suppress evidence seized from his vehicle after a traffic stop. (Doc. 20).

I. **Facts**

The following facts are taken from Officer Tanner Gomke's bodycam video and the hearing testimony.

In the late evening of September 13, 2018, Sidney Police Officer Tanner Gomke was patrolling traffic on North Central Avenue in Sidney, MT, when a white mid-size SUV with a headlight out drove past. Officer Gomke pulled behind the vehicle and initiated a traffic stop. The vehicle had Nevada plates.

Officer Gomke approached the vehicle on foot from the passenger side and knocked on the window. When the driver rolled down the window, Officer Gomke told him he pulled him over because he had a headlight out. The driver looked a

1

little surprised and said it must have just happened. The driver had a heavy accent, possibly Hispanic. Officer Gomke asked how he knew it just happened and the driver explained he had just filled up on gas and the headlight was fine. Officer Gomke replied, "Ok, sounds good. Well, it's just going to be a warning tonight, no tickets, ok?" After asking if there were any weapons in the vehicle, to which the driver said no, Officer Gomke asked for the driver's license and registration. The driver handed Officer Gomke his driver's license, insurance, and registration.

While inspecting the documents, Officer Gomke began questioning the driver. "What brings you to Sidney," he asked. The driver responded, "I'm going to Williston." "Going to Williston? Ok, what do you do in Williston, exactly," Officer Gomke asked. "I'm going to work for a friend," the driver said. "Does he own the business, or what exactly, what company" Officer Gomke inquired. "No," the driver said, adding "he works for a company." "Oh ok, what company is it," Officer Gomke pressed. The driver couldn't remember the name of the company, but asked "Can I call him?" Officer Gomke said, "I was just kind of curious what company it was." The driver responded again he couldn't remember the name. Officer Gomke asked, "How long have you known your friend?" The driver replied, "My friend? I've known him three, four, five years. He's the father of my stepdaughter." "Oh ok, what's his name," Officer Gomke asked. "Jesus Rico," the driver said. "Ok, sounds good," Officer Gomke said, before adding, "Where are

you living these days there—how do you say your first name . . . Porfirio—Where are you living these days, what's your current address?" Porfirio provided a Las Vegas address and phone number.

After taking down Porfirio's contact information, Officer Gomke resumed his questioning. "So you don't know the company where you're going to be working," he asked. "I don't remember the name," Porfirio replied. "Well, have you guys been talking about this," Officer Gomke asked. "He just gave me the invitation to come to work," Porfirio answered. "Oh, ok, sounds good. So what exactly do you do for work there," Officer Gomke quizzed. "He's concrete, he's a foreman, and I'm going to be doing forms," Porfirio said. "Oh, ok, sounds good. Alright, sir, so what I'll do, I'll just have you go ahead and hop out of the vehicle and come back, come speak to me at my vehicle, ok," Officer Gomke ordered.

Porfirio exited the vehicle and Officer Gomke asked again if he had any weapons, to which Porfirio again said no. Officer Gomke directed Porfirio to stand at the front of the squad car. Officer Gomke retrieved his computer from inside the squad car and placed it on the hood. Porfirio was standing at the front of the squad car, as directed, with his hands in his pockets. Officer Gomke requested Porfirio to take his hands out of his pockets, so Porfirio placed his hands on the hood. Officer Gomke advised him, "You can relax, I just want you to stand at the front of the

vehicle." Porfirio removed his hands from the hood, crossed them across his chest, and asked if that was ok. Officer Gomke said "Yep, you're good."

As Officer Gomke began typing information into the computer, he began questioning Porfirio again. "So, you said you're going to Williston, huh," Officer Gomke began. "Yes, sir," Porfirio said. "What time did you leave, when did you leave from Vegas," Officer Gomke asked. "Four o'clock in the morning," Porfiro replied. "Four o'clock? Ok. How long of a drive is it," Officer Gomke said. "It's about maybe 20 hours, and right now, what, so far, it's been 17, 18," Porfirio said, and continued, "I'm making fifteen dollars an hour, in Vegas, and I got an offer, just for labor, nineteen dollars an hour, so, I came to try it." "Did he tell you exactly what else you're going to be doing besides forms," Officer Gomke asked. "Just setting forms, and I work on my own doing landscaping, so probably that's another option," Porfirio responded. "Ok. So, do you have any tools with you in the vehicle," Officer Gomke inquired. "No sir, they are going to provide the tools," Porfirio said, adding, "I've never worked setting forms before." "You've never done forms before," Officer Gomke asked. "No, but what I did all the time, was landscape," Porfirio said.

At this point in the questioning, Officer Gomke opened Google on the laptop and searched the distance between Las Vegas and Sidney. Ten to fifteen seconds of silence passed. Porfirio broke the silence by offering, "You're going to see I'm

paying tickets, that's probably what's," before Officer Gomke interrupted, "What are you paying tickets for?" Porfirio explained he had a speeding ticket and a jay walking ticket out of Las Vegas he was working to pay off. A few more seconds of silence passed, then Officer Gomke resumed questioning Porfirio about his work. "So, how did you get hooked up with your buddy there, how did he tell you about the job, or can you tell me more about that" he said. "He called his ex-wife, with the daughter, and he said how are you going to work, I said sometimes I work, sometimes not, and he said, if you want to work you are going to drive, well, maybe I can for a couple of weeks and see how much they pay," Porfirio replied.

After ten to fifteen more seconds of silence passed, Officer Gomke started up again. "So besides traffic stuff, have you ever been in trouble before," he asked. "No sir," Porfirio replied. "Nothing at all? Anything for like, criminal mischief . . . like breaking a window," Officer Gomke questioned. "No sir, never, never," Porfirio responded. "What about for disorderly conduct, or anything like that," Officer Gomke inquired. "No, no," Porfirio said. "Have you ever been on probation or parole, or anything like that," Officer Gomke persisted. "No sir, no, I'm sixty years old, I'm not making those kind of problems," Porfirio answered. "Alright, sounds good, I'm just going to get a warning typed up for you real quick, ok," Officer Gomke stated. Officer Gomke then explained that Porfirio may get pulled over again by other officers working that night, but if that happened, to

show the officer the warning and explain he'd already been stopped for the headlight issue. Porfirio asked if there was anywhere he could stop for a few hours until an auto parts store opened, and Officer Gomke told him the gas station Porfirio had recently stopped at sold headlights, although they may not have the specific headlight he needed.

Officer Gomke asked for Porfirio's physical characteristics, such as height, weight, and hair and eye color, and Porfirio provided the information. Then, for a sixth time, Officer Gomke's questions began again. "So you don't know the company you're going to be working for," he asked. "No, sir," Porfirio replied. "Is it his business," Officer Gomke said. "No, it's a big company," Porfirio answered. "It's a big company, ok, do you have it on your phone where he talked about it," Officer Gomke pushed. "No, no, we just were talking, he's kind of high level, he's going, as soon as I get there, I'm going to start working, he said they are working too many hours, 16, 19, if you came, you can work more hours, but, you know, the most I can work is probably 16 hours," Porfiro responded.

Officer Gomke pushed a little further this time. "Ok, I just think it's kind of weird, you're driving twenty hours to work somewhere and you don't know where exactly you're going to be working," he stated. "I just listened to what he told me," Porfirio said. "Ok, sounds good. Did you guys ever talk about it on your phone or anything," Officer Gomke asked again. "I don't have it on right now, I'm

trying, it's been real hard for me, is it straight? Williston? I tried to call him many times," Porfirio replied. "How do you know your directions, do you have it on GPS, do you have a map," Officer Gomke asked. "I just follow the signs," Porfirio answered. "Ok, alright, I got to get back in my car and print this warning out so just go ahead and hang out there, ok," Officer Gomke said. Officer Gomke briefly went inside his squad car and re-emerged with a printed warning. "Alright, so once I give this back to you, you're free to leave, I just have to explain it to you real quick," Officer Gomke said, holding the warning out for Porfirio to read. Officer Gomke proceeded to read the warning and explain what to do if Porfirio was pulled over again.

As Officer Gomke handed the warning to Porfirio, he said, "So there's all your stuff back, I just have a few questions if you don't mind." Porfirio said, "ok," as he reached out for the warning. Almost before Porfirio could finish saying "ok," Officer Gomke launched into the same line of questioning as before. "So, you said, what time did you leave today," he asked. "Four o'clock in the morning," Porfirio answered. "You left at 4 AM and it's about eleven right now, so we're talking nineteen hours, so we're on track there," Officer Gomke said, then prodded, "And you're heading where, again?" Porfirio responded, "Williston." "Williston, ok. And you're heading to meet up with who," Officer Gomke questioned. "My friend," Porfirio said. "And what was your friend's name,"

Officer Gomke pressed. "Rico," Porfirio replied. "Rico who," Officer Gomke pushed. "Jesus Rico, R-I-C-O," Porfirio laid out. "Ok, what was his last name," Officer Gomke asked again. "Rico. Last name. Oh, you said first name, Jesus, J-E-S-U-S," Porfirio said again. "Ok, sounds good. And what kind of work are you going to be doing there again," Officer Gomke asked. "I'm going to set forms, concrete," Porfirio answered.

Officer Gomke tried a new question. "So do you have any, how long are you going to be staying there, how long are you going to be working in Williston" he asked. "Well, I'm going to try, if I really like it, I want to stay here. You know, they work all the time, even in winter time probably they just work eight hours, but they stay working all the time. That's what I'm looking for," Porfirio responded. "Ok. But you really don't know how long you're going to stay there," Officer Gomke persisted. "I want to stay. If the pay is what I'm expecting, I want to stay here. Probably, I don't know, maybe the whole year. Maybe I can bring my family." Officer Gomke saw an opening. "Ok. Do you have luggage in the car with you," he asked. "No, sir," Porfirio said, walking back to his car and opening the trunk, showing Officer Gomke a standard tool bag. "So this is all you brought with you, just some tools there, and so basically the only thing you brought with you," Officer Gomke started before Porfirio chimed in, "I have a couple underwears and socks."

As Porfirio closed the trunk, Officer Gomke began walking to the front passenger side of the vehicle. "Where's it at," Officer Gomke asked, shining his flashlight in the vehicle. "Up here," Porfirio said, reaching through the open window and holding up some underwear and socks. "Ok. Just a couple underwear and socks," Officer Gomke said. "Yeah, you know, I can buy the rest of the clothes here," Porfirio remarked. "Hey, so, I mean, it's kind of odd to me how you're heading over here to work, you don't know how long you're going to be here, but you only brought underwear and socks," Officer Gomke opined. "That's right, that's right. You know, I got my family in Vegas, if I stay here, I'm going to buy maybe a couple shirts, couple pants, go and get my stuff and come back over," Porfirio said. "Ok, sounds good," Officer Gomke stated, before delivering his final question: "Hey, so, would you mind if I searched your vehicle real quick?" "If you want to," Porfirio said.

Officer Gomke's search of Porfirio's vehicle uncovered methamphetamine hidden in the spare tire compartment.

## II. Law

If a person is stopped for violating the traffic code, the stop may not be prolonged beyond the time reasonably required to complete the mission of the stop absent independent reasonable suspicion to detain the person further. *Rodriguez v. United States*, 135 S.Ct. 1609, 1614 (2015) (citing *Illinois v. Caballes*, 543 U.S. 405,

407 (2005)). The mission of the stop includes determining whether to issue a ticket for the infraction and inquiries ordinary to enforcing the traffic code. *Rodriguez*, 135 S.Ct. at 1615. Such inquiries are, typically, checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. *Rodriguez*, 135 S.Ct. at 1615. Authority for the stop ends when tasks tied to the traffic infraction are, or reasonably should have been, completed. *Rodriguez*, 135 S.Ct. at 1614

Officers are permitted to conduct certain unrelated inquiries or checks so long as it does not prolong the stop. *Rodriguez*, 135 S.Ct. at 1615. For instance, officers are permitted to use a drug dog to sniff a validly stopped vehicle so long as it does not prolong the stop. *Caballes*, 543 U.S. at 408-409. Likewise, officers may question drivers on unrelated matters so long as the questioning does not extend the stop. *Rodriguez*, 135 S.Ct. at 1615 (citing *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)). But if an officer does go beyond the scope of the traffic mission and performs unrelated inquiries or checks, the critical question is not when the unrelated inquiry occurs but rather whether the unrelated inquiry prolongs, i.e., adds time to, the stop. *Rodriguez*, 135 S.Ct. at 1616. Even a brief or de minimis lengthening of the stop is unconstitutional. *Rodriguez*, 135 S.Ct. at 1615. Thus, an officer who strays beyond ordinary traffic inquiries risks transforming a constitutional stop into an illegal one. *Rodriguez*, 135 S.Ct. at 1616.

## III. Discussion

Porfirio argues Officer Gomke's unrelated questions unconstitutionally prolonged the stop and he was therefore unlawfully seized when he consented to the search. The government has three arguments in response. First, the government argues the stop was not prolonged. Second, the government argues Porfirio was no longer detained when he consented to the search. Third, the government argues even if the stop was prolonged and even if Porfirio was detained when he gave consent, Officer Gomke had reasonable suspicion to extend the stop. Because the extension of the stop issue provides the context for whether Porfirio was detained when he gave consent to search, the Court addresses the government's arguments out of order.

Whether due to cunning, training, coincidence, or some other reason, the video establishes a clear pattern: Officer Gomke performs one or two traffic related tasks, pivots to unrelated questions, and when the questions don't produce anything obviously nefarious, he pivots back to traffic related tasks. Shortly after asking for and inspecting Porfirio's license and registration, Officer Gomke launched into a series of unrelated questions. After a couple minutes, Officer Gomke ended the questions and ordered Porfirio to come back to his patrol car, where the pattern continued. Officer Gomke typed some information into the computer, briefly stopped or slowed, and started questioning Porfirio again on unrelated matters. At

one point, Officer Gomke opened Google to search the distance from Las Vegas to Sidney, a task patently unrelated to the traffic stop which prolonged the encounter.

The government argues Officer Gomke was free to ask questions so long as he diligently performed traffic related tasks. But the fact Officer Gomke was intermittently performing traffic related tasks does not save the government because under *Rodriguez* the crucial question is whether performing the unrelated tasks added time to the stop. Several times, in clear violation of *Rodriguez*, Officer Gomke performed no traffic related tasks while asking unrelated questions. At other times, Officer Gomke attempted to multi-task by performing background checks while asking unrelated questions. But even those instances violated *Rodriguez* because "if an officer can complete traffic-based inquiries expeditiously, then that is the amount of time reasonably required to complete the stop's mission." 135 S.Ct. at 1616. It defies common sense to suggest Officer Gomke's repeated questioning did not slow or delay his performance of traffic related tasks. Without belaboring the point, Officer Gomke's forays into unrelated questions continued throughout the encounter and added time to the length of the stop. Under *Rodriguez*, the stop was therefore prolonged. Officer Gomke's extension of the stop was unconstitutional unless he developed independent reasonable suspicion to detain Porfirio further.

Reasonable suspicion requires "a particularized and objective basis for suspecting the particular person stopped of breaking the law." *Heien*, 135 S.Ct. at

12

536 (citing *Navarette v. California*, 134 S.Ct. 1683, 1687 (2014)). The reasonable suspicion necessary to justify an investigative stop is dependent upon both the content of information possessed by police and its degree of reliability. *Navarette*, 134 S.Ct. at 1687 (citing *Alabama v. White*, 496 U.S. 325, 330 (1990)). The officer's reasonable suspicion must be particular to the person stopped. Prefabricated or recycled profiles of suspicious behavior "very likely to sweep many ordinary citizens into a generality of suspicious appearance" will not suffice. *United States v. Rodriguez*, 976 F.2d 592, 595-596 (9th Cir. 1992). In determining reasonable suspicion, the Court must consider all of the information under the totality of the circumstances. *Navarette*, 134 S.Ct. at 1687.

A search through the government's brief for evidence of objectively suspicious activity is a search in vain. Nonetheless, the government attempts to build reasonable suspicion innocuous brick by innocuous brick, citing evidence such as Porfirio asking if there was an auto part store nearby so he could fix his broken headlight *for which he was just stopped by the police*. Another example: Porfirio said he used road signs for directions. Yet another: Porfirio, who in Las Vegas "sometimes worked, sometimes didn't" at a landscaping job for $15 an hour, was traveling to Williston on the promise of a friend that Porfirio could work up to 16 hours a day for $19 an hour. Porfirio stated the friend was management level at a construction company, provided the friend's full name, and explained the friend was

the father of his stepdaughter. And another: Porfirio decided to drive straight through instead of getting, and paying for, a hotel.

The government continues on this tack, arguing Porfirio's actions coupled with Williston being a high drug trafficking area amounts to reasonable suspicion. It's true that single innocent actions considered cumulatively may amount to reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 275 (2002). The trouble with that argument under these facts is two-fold. First, the cumulation of this evidence dispels, rather than raises, suspicion. Considered in isolation, it may seem slightly odd someone drove from Las Vegas to Williston straight through. But the deeper Officer Gomke dug, the more normal Porfirio's actions seemed. Each time Officer Gomke asked a question about something he found odd, Porfirio provided a reasonable explanation. Not only that, Porfirio provided consistent answers to seven rounds of the same questions. Officer Gomke never tripped him up, never caught him in a lie. Second, the argument is based on a recycled profile of suspicious behavior "very likely to sweep many ordinary citizens into a generality of suspicious appearance." *Rodriguez*, 976 F.2d at 595-596. As presented, Porfirio was a part-time landscaper from Nevada driving to Williston for a construction job that promised full-time work at significantly higher pay. The United States Constitution does not tolerate the police detaining people who fit that profile and nothing more.

The extension of the stop was therefore unconstitutional because Officer Gomke did not have reasonable suspicion of criminal activity.

With that backdrop, the question shifts to whether the unconstitutional seizure was terminated before Porfirio gave consent to search. The government argues Porfirio was free to leave when Officer Gomke handed him the printed warning but he instead voluntarily chose to stay to answer more questions, including whether Officer Gomke could search the vehicle.

An encounter is not consensual if "a reasonable person would have believed he was not free to leave." *United States v. Chavez-Valenzuela*, 268 F.3d 719, 724-725 (9th Cir. 2001) (overruled on other grounds) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). In *Chavez-Valenzuela*, the officer pulled the defendant over for following too closely. The officer asked for the defendant's license and registration and, after being given the documents, radioed dispatch to verify the information. While waiting for dispatch to verify, the officer began asking the defendant a series of questions, including his starting point, his destination, whom he was visiting, and where he worked. After dispatch verified the information was accurate, the officer returned the documents to the defendant. The officer asked the defendant if there were any drugs in the car, to which the defendant said no. The officer then asked if he could search the car, to which the defendant said yes. The Ninth Circuit held the defendant was still seized after the officer returned the

documents because he had been standing by the side of the highway for more than seven minutes, subjected to "a number of fishing expedition questions" about his travel plans and occupation, and, after having his documents returned to him, was then asked an incriminating question. Under those facts, the Ninth Circuit concluded a reasonable person would not have felt free to leave. 268 F.3d at 724-725.

Here, similar to *Chavez-Valenzuela*, Porfirio was subjected to a roadside interrogation consisting of fishing expedition questions, some of them repeated as many as six times by then, prior to being given the printed warning. Although Officer Gomke said the magic words "you're free to leave," he immediately backtracked that notion by then telling Porfirio he had to explain the warning first. After he was done explaining the warning and handed it to Porfirio, he offered very subtly, "I just have a few questions if you don't mind." Almost before Porfirio could finish saying, "Ok," however, Officer Gomke launched into another line of questioning, most of which Porfirio had already answered numerous times. A reasonable person would not have felt free to leave in that situation because, like the defendant in *Chavez-Valenzuela*, he likely would not believe he could disregard the officer's questions after he had answered them so many times, only to be asked again.

Therefore, because the stop was unconstitutionally extended, and because Porfirio was detained after authority for the stop ended or should have ended, his

consent was the result of a constitutional violation and must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 491 (1963).

As a final note, even assuming Porfirio was not detained when he gave consent, the unconstitutional taint of the extended stop cannot be purged from the consent. *Florida v. Royer*, 460 U.S. 491, 507-508 (1983). To determine whether the taint was sufficiently purged, courts ask whether the evidence has been discovered by exploitation of an illegality or instead by means sufficiently distinguishable to be purged of the primary taint. *United States v. Millan*, 36 F.3d 886, 890 (9th Cir. 1994). Relevant considerations include temporal proximity between the illegality and consent, the presence of intervening circumstances, and the purpose and flagrancy of the police misconduct. *United States v. George*, 883 F.2d 1407, 1416 (9th Cir. 1989). The ultimate question is whether an illegally detained person's response to police questioning is sufficiently an act of free will to purge the primary taint of the illegality. *George*, 883 F.2d at 1416.

Here, even assuming Porfirio was free to leave, the Court cannot conclude the consent purged the taint of the illegally extended stop. It's questionable whether in the context of a traffic stop an unconstitutional seizure can ever be adequately purged without a significant intervening circumstance. In *Chavez-Valenzuela*, which contains very similar facts to this case, the Ninth Circuit held the taint could not be purged by consent because "the consent did not occur in a vacuum." 268 F.3d at

728. Similar reasoning applies here. Porfirio's consent occurred within a couple minutes of the termination of an unconstitutionally extended stop. Throughout that encounter, Porfirio repeatedly answered questions unrelated to the traffic stop. In this case, it is impossible to sufficiently divorce the preceding encounter from the consent that was given moments later. Therefore, under *Royer* and *Chavez-Valenzuela*, even assuming Porfirio was free to leave when he gave consent to search, the evidence must still be suppressed because the taint of the illegally extended stop cannot be purged from the consent given moments later.

### IV. Conclusion and order

Porfirio's motion to suppress (Doc. 20) is GRANTED.

DATED this 25th day of June, 2019.

SUSAN P. WATTERS
United States District Judge